■ WALLY G., an Infant, by His Mother and Natural Guardian, YOSELIN T., Appellant, v NEW YORK CITY HEALTH AND HOSPITALS CORPORATION (METROPOLITAN HOSPITAL), Respondent. [992 NYS2d 232]—

Order, Supreme Court, New York County (Douglas E. McKeon, J.), entered on or about November 21, 2012, which granted plaintiff's motion to reargue, and upon reargument, adhered to its prior order, entered on or about January 26, 2012, denying plaintiff's motion for leave to serve a late notice of claim, and granting defendant's cross motion to dismiss the complaint, affirmed, without costs. Appeal from the January 26, 2012 order, dismissed, without costs.

In this action for medical malpractice, in which the infant

plaintiff seeks to recover for injuries he suffered after being born at 27 weeks' gestation, the motion court considered the pertinent statutory factors and properly exercised its discretion in denying plaintiff's motion (General Municipal Law § 50-e [5]). The infant plaintiff's mother's excuses that she was unfamiliar with the requirement that she file a notice of claim, and that she was unaware that her son's injuries were caused by defendant Health and Hospital Corporation's (HHC) malpractice, are not reasonable. Nor is her attorney's assertion that he waited to make the motion until approximately three years and ten months after filing the untimely notice of claim because he needed to receive the medical records from HHC (*see Basualdo v Guzman*, 110 AD3d 610, 610 [1st Dept 2013]).

Further, the medical records demonstrate that the infant plaintiff's condition and prognosis are consistent with his premature birth and do not suggest any injury attributable to the hospital staff's malpractice (*see Torres v New York City Health & Hosps. Corp. [Lincoln Hosp.]*, 101 AD3d 463, 463 [1st Dept 2012], *lv denied* 21 NY3d 860 [2013]). Moreover, plaintiff failed to demonstrate that the medical records put HHC on notice that the alleged malpractice would subsequently give rise to brain damage as a result of birth trauma and hypoxia or that he would subsequently develop other deficits, delays, and disorders (*see Rodriguez v New York City Health & Hosps. Corp. [Jacobi Med. Ctr.]*, 78 AD3d 538, 538-539 [1st Dept 2010], *lv denied* 17 NY3d 718 [2011]).

Significantly, plaintiff's experts do not claim that the extreme prematurity of his delivery (during the seventh month of gestation) was attributable to any fault on HHC's part. In fact, plaintiff's experts opine that the cesarean section delivery should have been performed even earlier than it was. In view of the fact that plaintiff's injuries are typical of children born as prematurely as he was, as well as HHC's undisputed lack of fault for the necessity of a preterm delivery, we, like the motion court, are not persuaded by plaintiff's argument, accepted by the dissent, that the medical records put HHC on notice that plaintiff's injuries may have been caused by the alleged deviations from the standard of care that plaintiff's experts perceive to be documented in the record, rather than by the unavoidable necessity of delivering the child only 27 weeks into the pregnancy. Plaintiff's experts, although claiming to identify deviations from the standard of care in the record, fail to articulate any basis for determining the extent to which plaintiff's deficits were caused by the alleged deviations, as opposed to the unavoidable preterm delivery. Given that the medical records,

even as interpreted by plaintiff's experts, do not yield a nonspeculative basis for determining whether the deficits of this prematurely born child would have been less severe absent the alleged deviations, it cannot be said that the medical records put HHC on notice of the claim. As the motion court correctly stated: "There is insufficient evidence to support the finding that the infant's condition upon delivery and the subsequent issues that developed during his admission to the [neonatal intensive care unit] were caused by any malpractice as opposed to the infant's extremely premature birth, which could not have been avoided."

Finally, plaintiff's infancy carries little weight since there is no connection between the infancy and the delay (see Rodriguez, 78 AD3d at 539). Concur—Tom, J.P., Friedman and Andrias, JJ.

Acosta and Richter, JJ., dissent in a memorandum by Acosta, J., as follows: This appeal involves the propriety of denying a motion for leave to file a late notice of claim, made pursuant to General Municipal Law § 50-e (5) in a medical malpractice action against defendant New York City Health and Hospitals Corporation (HHC or Metropolitan Hospital), in which it is alleged that the medical staff failed to properly render both prenatal and postnatal care to the infant plaintiff and to properly manage his mother's labor and delivery at 27 weeks' gestation. Plaintiff argued that HHC acquired actual knowledge of the essential facts constituting the claim within 90 days of the alleged malpractice, or a reasonable time thereafter, because the facts constituting the alleged departures from good and accepted standards of care were explicitly documented in the medical records. In particular, plaintiff asserted that the mother had a labor and delivery complicated by placental abruption,[1] chorioamnionitis,[2] and fetal tachycardia,[3] and that after the infant suffered a grade III intraventricular hemorrhage, he "was referred directly to the developmental clinic and early intervention," explicitly demonstrating that the hospital staff was on notice of the injury. I agree with plaintiff and would therefore reverse.

Background

The infant plaintiff was born on June 15, 2005. Pursuant to General Municipal Law § 50-e (1), plaintiff was required to serve

---

1. Placental abruption is the premature separation of the placenta from the uterine wall prior to delivery, which compromises the ability of the placenta to supply the fetus with oxygenated blood.

2. Chorioamnionitis is an infection of the placental membranes which compromises the ability of the placenta to supply oxygen to the fetus.

3. Tachycardia is defined as an excessively rapid heartbeat.

a notice of claim on HHC by November 8, 2005 (90 days after the child's discharge from the hospital). Plaintiff served an untimely notice of claim by letter dated January 16, 2007. This action was commenced when plaintiff filed the summons and complaint on August 4, 2008, which was within the statute of limitations, as tolled by CPLR 208. On December 9, 2010, plaintiff sought an order deeming his previously served notice of claim timely nunc pro tunc, or for leave to file a late notice of claim. The motion court denied plaintiff's request and granted defendant's cross motion to dismiss.

The infant plaintiff suffers from cerebral palsy, seizures, hemiparesis, and speech and cognitive defects. His mother avers that his current condition is the result of defendant's failure to both timely deliver the infant in the face of evidence of placental abruption, infection, and fetal distress, and to properly monitor and treat respiratory distress in the newborn.

Specifically, the infant's mother stated that, prior to her son's birth, she had been bleeding vaginally for weeks and was "passing large clots of blood." Although her doctors had mentioned that it might be due to an abruption, they decided that it was not and told her to return if the bleeding became worse.

Dr. Stuart Edelberg averred, to a reasonable degree of medical certainty, that after reviewing the infant plaintiff's medical records it was his opinion that departures from good and accepted medical practice by HHC's hospital staff were a proximate cause of the infant plaintiff sustaining hypoxic-ischemic brain injury by placental abruption and chorioamnionitis. He also opined that the child's "[p]rolonged exposure to cytokines in utero further contributed to [his] fetal brain injury."

Dr. Edelberg averred that the medical records demonstrated that the mother's prenatal care "was complicated by the fact that she was a type 1 diabetic with a history of prior preterm birth in March of 2002 at 29 weeks and a miscarriage at 5 weeks in October of 2003." He also stated that the hospital staff was on notice that the mother "was at risk for complication by excessive bleeding," because her "prior preterm delivery was associated with 'bleeding complications.'"

Hospital records indicate that on May 24, 2005, the mother went to HHC, and according to a triage note, "bleeding ha[d] been ongoing for two days and [wa]s significant for bright red blood with small pink clumps of tissue." The staff discharged the mother after determining that the "vaginal spotting" was "most likely [secondary] to [a] low-lying placenta" and that she should "return to [the] hospital if [there was] increased bleeding." The mother returned to the hospital seven hours later, af-

ter experiencing "pelvic pain and a gush of red blood at home." A "sterile speculum examination" was performed, which revealed that "the cervical os appeared closed and [that there was] a small 5 cc clot . . . in the vault" with "a subsequent rush of clear fluid which was interpreted as [a] rupture of [the] membranes." The admission assessment was "vaginal bleeding, rule out placental abruption, preterm premature rupture of membranes," and the plan included "antibiotics and dexamethasone to facilitate fetal lung maturity."

A subsequent attending note taken that same day, however, set forth a differential diagnosis of a partial abruption. According to Dr. Edelberg, since placenta previa was effectively ruled out by sonogram on May 24, 2005, the cause of the bleeding and passage of clots was a placental abruption, which was confirmed on the day the infant plaintiff was born, as noted, June 15, 2005. Although the consulting physician's opinion was that there was no abruption, the consult does not set forth the reasoning for that opinion other than by reference to a sonogram, which, according to Dr. Edelburg, is insufficient to rule out an abruption and "ignored the clear clinical evidence of abruption in the form of chronic bleeding and passage of clots" and the fact that the mother complained of back and abdominal pain. Based "on the symptoms," Dr. Edelburg opined that the mother had been exhibiting "an ongoing worsening chronic abruption" since May 24, 2005.

Dr. Edelberg averred that on May 25, 2005, blood clots were observed and the mother reported pelvic and back pain, which are symptoms of placental abruption. A sterile speculum exam revealed that the cervix was not dilating. The neonatologist discussed the risks of premature birth with the mother.

On May 26, 2005, the mother "reported a loss of fluid and [a] foul smelling discharge, indicative of infection, while she continued to complain of back pain." On May 29, 2005, the mother was stable enough that hospital staff contemplated transferring her to the labor and delivery unit. However, the mother "left the hospital against medical advice" and staff "advised [her] to return in 48 hours for evaluation."

On May 31, 2005, the mother returned to the hospital and reported that she had been vaginally bleeding since the previous afternoon. A speculum examination revealed blood in the vaginal vault; the cervical os appeared closed and long. A sonogram revealed that placenta previa was not the cause of the mother's bleeding, and the fetus appeared to be doing well. A perinatal consult opined "that there was no evidence of abruption" and the mother "was discharged on ampicillin for [a] pos-

sible urinary tract infection, with instructions to return to the clinic in 2 weeks, or if symptoms recur."

According to Dr. Edelberg, given the mother's history and clinical signs of abruption, hospital staff departed from good and accepted standards of care, by discharging her on May 31, 2005, and that instead she should have been admitted to the hospital for close monitoring and observation. Moreover, "[v]aginal infection can and in this instance did lead to premature labor and the development of chorioamnionitis."

On June 4, 2005, the mother appeared at the hospital and told staff that she had been bleeding vaginally for one week. There was decreased fetal movement, and positive maternal weakness and dizziness. Although a vaginal exam did not reveal any active bleeding, clots were found in the mother's vagina. Although "[t]he diagnosis of the hospital staff was intrauterine pregnancy at 25 weeks with possible chronic placental abruption," Dr. Edelburg opined that the hospital departed from good and accepted practice by sending the mother home and telling her to follow up with the clinic, because her "presenting symptoms indicated placental abruption and maternal infection, both of which required close monitoring, particularly at 25 weeks gestation." Moreover, the doctor asserted that at "some point[,] chronic placental abruption will result in a reduced flow of oxygenated blood" from the mother to the fetus, "causing a hypoxic ischemic event," which "the labor and delivery record reveals . . . was the case."

On June 14, 2005, the mother returned to the hospital and "presented with a history of vaginal bleeding and clots in the vagina and a history of chronic bleeding." However, she was sent home with an instruction to return if the bleeding increased.

On June 15, 2005, the day the infant plaintiff was born, the mother was admitted to the hospital at 1:00 p.m., and "presented with a history of abdominal pain with vaginal bleeding with passage of clots for one day." The mother was noted as being "a class D diabetic since age 6 being treated with glyburide." "A speculum exam was conducted and large clots were noted; a pelvic exam revealed [that the mother] was 4 cm dilated, 50% effaced and at -3 station." The mother's temperature was "elevated" at 100.7 degrees, and the fetal heart rate was at 150 to 160 beats per minute, both of which are "symptomatic of chor[i]oamnionitis."

Dr. Edelberg averred that fetal tachycardia was evidence of fetal distress and that it was documented in the records on June 15, 2005, because the heart rate was "at the level of 180

beats per minute." There was also evidence of fetal distress in the form of decelerations of the fetal heart rate and "[a]ll of these findings are caused by an ongoing and worsening hypoxic ischemic insult to the fetal brain as a result of the placental abruption and chorioamnionit[i]s."

After the infant plaintiff was born, he was assigned Apgar scores of 5 at one minute and 7 at five minutes, but no breakdown of those scores was provided. Testing indicated "a chronic hypoxic ischemic process requiring the exhaustion of the body's reserves to counteract acidosis" and "a depressed neonate . . . as a result of chorioanmionitis and placental abruption, both of which affect the ability of the placenta to oxygenate the fetus, superimposed on prematurity (the infant being approximately 27 weeks gestation)."

Dr. Edelberg opined that the mother should have been prepared for emergency cesarean section and her infant delivered no later than 1:30 p.m., given her obstetrical history, the tentative diagnosis arrived at on June 4, 2005, and her presentation on June 15, 2005 with increased symptoms such as passing large blood clots. Although "the decision to deliver by cesarean section due to placental abruption and probable chorioamnionitis was made at 3:45 p.m., . . . delivery was not accomplished until 4:38 p.m.," which "[p]rolonged exposure to cytokines in utero [and] further contributed to [the child's] fetal brain injury."

Dr. Rosario R. Trifiletti averred that on June 23, 2005, the infant plaintiff was diagnosed with an intraventricular hemorrhage (IVH), which was "consistent with a significant hypoxic ischemic insult." "The clinical and radiological observations, particularly the intraventricular hemorrhage observed in the first days of life, established conclusively the existence of a neonatal neurological syndrome as a result of hypoxia/ischemia and hypocarbia." Moreover, according to Dr. Trifiletti, the child's lack of spontaneous respiratory effort indicated that the Apgar scores were inaccurate and overly optimistic, because the clinical picture indicated a severely depressed neonate with no ability to breathe on his own, which is also consistent with in utero hypoxic ischemic insult. At roughly seven months of age, the child was diagnosed with seizures at HHC.

Dr. Trifiletti opined that to a reasonable degree of medical certainty, the infant plaintiff "suffers from neurological and cognitive deficits," which "were the result of hypoxia/ischemia, or oxygen deprivation, in utero and exposure to cytokines" and that he had "a form of cerebral palsy known as hemiparesis." According to Dr. Trifiletti, since the "causal relationship be-

tween chorioamnionitis and brain injury is well established," "the Metropolitan Hospital staff, who made an explicit diagnosis of chorioamnionitis, were absolutely on notice that the infant had a significantly increased likelihood of having suffered brain injury." He also opined that "[i]n view of the severe intraventricular hemorrhage, there is no doubt that the Metropolitan staff was on notice that this infant had suffered a significant neurological injury," and that "the issue of subsequent neurological sequelae was explicitly discussed with the parents after the diagnosis of the grade III IVH." He additionally opined that the child's seizures were "caused by the hypoxic ischemic insults to the brain."

Dr. Trifiletti opined that the infant plaintiff's cytokine exposure and in utero hypoxia ischemia were the result of HHC's staff's negligent failure to timely deliver the infant by cesarean section, despite the presence of chorioamnionitis and placental abruption. The further hypoxic ischemic insult, which occurred during the newborn period, was the result of the staff's negligent failure to provide immediate adequate respiratory support by ventilation through intubation. Thereafter, the child was overventillated, causing him to develop hypocarbia and associated decreased cerebral blood flow, and the medical records document facts that put the hospital staff on notice that he had suffered an injury to the brain during the perinatal and neonatal period and that his injuries would lead him to suffer from motor and cognitive deficits.

Dr. Stuart Danoff opined, to a reasonable degree of medical certainty, that there were departures from good and accepted medical practice by HHC's staff that were a proximate cause of infant plaintiff sustaining a brain injury.

Dr. Danoff averred that the infant plaintiff's "Apgar scores are variously described as 5 at one minute and 7 at five minutes in the obstetrical record . . . and 6 at one minute and 8 at five minutes in the newborn record," which are "contradictory on its face." Moreover, "no breakdown is provided as to what scores were assigned for individual categories in either the obstetrical or newborn record," which was "a departure from good and accepted standards of care [and] contributed to the inadequate resuscitative measures undertaken."

According to Dr. Danoff, when the infant plaintiff was born, given his "prematurity and fetal distress, it was extremely likely that [he] would require a significant degree of resuscitative intervention," and "he should have been intubated within one minute and placed on mechanical ventilation as quickly as practicable." However, when the baby was born with "a

complete absence of respiration," hospital staff improperly oxygenated him, and he was not placed on a mechanical ventilator until 22 minutes after his birth (i.e., 5:00 p.m.), after they twice attempted and failed to resuscitate him with efforts they should have known would fail.

Dr. Danoff averred that the failure of HHC's staff to timely intubate the infant plaintiff caused him "to suffer [from] a . . . lack of oxygen," and that at birth, the child "was suffering from a metabolic acidosis as a result of an in utero hypoxic event." He opined that "minutes of hypoxia can and did cause brain damage" to the child.

According to Dr. Danoff, after HHC's staff "fail[ed] to adequately oxygenate and resuscitate" the infant plaintiff following his delivery, they further departed "from good and accepted standards of care by overventilating" him, "causing him to suffer hypocarbia and diffuse brain injury." The medical records demonstrate that by June 23, 2005, HHC was "plainly aware that the infant had likely suffered a brain injury," because "a repeat sonogram show[ed] a bilateral ventricular hemorrhage with post hemorrhagic ventriculomegaly," which "was characterized as a grade III intraventricular hemorrhage." Moreover, the June 27, 2005 attending note stated that the "[c]ondition of the baby [was] discussed with both parents about the IVH which the baby has and the possible outcome and [possible] neurological sequelae."

In its cross motion to dismiss, HHC argued, among other things, that plaintiff's expert affidavits should be disregarded, because they failed to address whether the infant plaintiff's medical records provided HHC with actual notice of negligent conduct, but rather simply claimed that HHC's records showed that it inflicted injury upon the child. HHC additionally argued that the child's medical records documented that his premature delivery could not have been avoided and that his condition upon delivery and the subsequent issues that developed during his admission to the NICU were caused by his extremely premature birth.

In support of its motion, HHC annexed the expert affidavits of Dr. Adiel Fleischer and Dr. Walter Molofsky. Dr. Fleischer opined that the infant plaintiff's medical records demonstrated to a reasonable degree of medical certainty that Metropolitan Hospital's staff rendered care and treatment that was at all times within accepted standards of medical care and that no acts or omissions caused any of the child's alleged injuries. He also opined that the medical records do not provide HHC with notice that its staff was negligent in providing the child with

medical treatment. He additionally opined that it was not a departure from good and accepted medical practice to discharge the mother in light of her episodes of vaginal bleeding and that everything had been done to rule out a possible placental abruption prior to her delivery.

According to Dr. Fleischer, even assuming there was an abruption, admitting the mother to the hospital would not have stopped it from occurring. There was no specific treatment mandated prior to delivery and even if the mother was admitted, she would have undergone the same course. At all times the infant plaintiff's "condition was being monitored and at no time was there any indication of fetal distress." Moreover, "[t]he tracings do not demonstrate any ominous signs and they [we]re overall reassuring."

According to Dr. Fleischer, "[s]ince there was absolutely no signs of fetal distress, a cesarean section did not need to be performed on a 'STAT' basis." Once there was a suspicion of chorioamnionitis and once tachycardia was evident, the staff appropriately scheduled and performed a timely cesarean section and the infant plaintiff "delivered with Apgars of 6 and 8 (or 5 and 7 as also noted), weighing 990 grams," which is "not abnormal for a fetus born at approximately 26 weeks."

Dr. Fleischer opined that the hospital records do not indicate that the infant suffered injury due to "placental abruption, fetal distress or a delay in delivery" and that there are no indications of any negligent act or omission by HHC's staff.

Dr. Molofsky opined that there were no departures from good and accepted medical practice in the management of the mother's labor, delivery care, and treatment, and that there was no documentation in the hospital chart that provided HHC with notice that its staff had negligently provided treatment to the child.

Dr. Molofsky averred that although the child "was born small, he was appropriate for his gestational age." The child's Apgar scores "were also acceptable as most premature babies will not be vigorous or pink." Moreover, "[a]lmost every premature baby has apnea, regardless of the propriety of care rendered, because the last system to fully develop in a fetus is the control of breathing," and apnea "is expected in premature infants."

Dr. Molofsky averred that the infant plaintiff was diagnosed with a grade III intraventricular hemorrhage and that "almost every premature baby of this size develops some degree of bleeding and it is not indicative of fetal distress," and it "cannot be prevented" and "usually develops within 96 hours of life" (emphasis omitted). When the child was diagnosed with autism

on July 8, 2008 by one of his physicians, the diagnosis was "not secondary to a brain injury" and his "functional level is not related to his diagnosis of autism" (emphasis omitted).

Dr. Molofsky opined that "the infant experienced complications due to his premature birth and that this does not serve to alert [HHC] that he would develop any conditions now alleged to be the result of negligence in his perinatal care and treatment." The child's "developmental delays and resultant deficits were related to him being born at approximately 26+ weeks and . . . there was no evidence that the infant sustained hypoxic ischemic encephalopathy," nor was there evidence that any of the infant's respiratory issues or development of an IVH were related to placental abruption.

In reply, Dr. Edelberg opined, among other things, that the chronic bleeding the mother experienced between May 31, 2005 and June 15, 2005 "was caused by and evidence of a chronic placental abruption." Although the abruption itself may not have been treatable or preventable, the injury to the fetus caused in part by the abruption was preventable by timely delivery.

Dr. Trifiletti averred that Apgar scores of 6 and 8 are not normal findings for a newborn, even a premature newborn, and indicated neonatal depression as a result of fetal distress, as did the cord blood gas analysis, which indicated acidosis as a result of in utero hypoxia/ischemia. Further, the doctor asserted, the child's prematurity made it predictable that resuscitation by "PEEP and PPV" would be ineffective, and such efforts caused the staff to delay intubation until 4:55 p.m. According to Dr. Trifiletti, Dr. Molfosky's opinion that intubation was timely ignores the facts preserved in the medical record.

Dr. Trifiletti averred that his experience did not support the assertion that almost every infant of the infant plaintiff's size experiences some degree of bleeding, nor did the medical literature, which states that the vast majority of infants born prior to 35 to 36 weeks do not experience bleeding in the brain and that appropriate intervention after delivery could have prevented or reduced the injury to the child's brain.

Analysis

"In determining whether to grant [an] extension [to file a late notice of claim], the court shall consider, in particular, whether the public corporation or its attorney or its insurance carrier acquired actual knowledge of the essential facts constituting the claim within the time specified in subdivision one of [General Municipal Law § 50-e] or within a reasonable time thereafter" (General Municipal Law § 50-e [5]; *see also*

*Perez v New York City Health & Hosps. Corp.*, 81 AD3d 448 [2011]). In addition to actual knowledge of essential facts, the court should also consider "whether the claimant is an infant, whether there exists a reasonable excuse for the failure to serve the notice timely and whether the delay in serving the notice would substantially prejudice the municipality in its defense" (*Perez*, 81 AD3d at 448, citing *Williams v Nassau County Med. Ctr.*, 6 NY3d 531, 535 [2006], and *Matter of Dubowy v City of New York*, 305 AD2d 320, 321 [2003]; *see also* General Municipal Law § 50-e [5]). "[T]he presence or absence of any one factor is not determinative" (*Dubowy*, 305 AD2d at 321), and since the notice statute is remedial in nature, it should be "liberally construed" (*id.*).

Here, contrary to the majority's opinion, the hospital chart demonstrates that HHC had actual notice of the essential facts constituting the claim within 90 days of accrual or a reasonable time thereafter, as required by General Municipal Law § 50-e (5). Notably, the medical records need not conclusively document that malpractice caused the injury. Rather, they merely need to *suggest* injury attributable to malpractice (*Williams*, 6 NY3d at 537). The medical records in the present case document that the infant plaintiff's mother suffered a placental abruption and chorioamnionitis, and that the infant plaintiff suffered a grade III intraventricular hemorrhage. After reviewing the medical records, plaintiff's experts averred that the hospital staff deviated from the standard of care. There was, according to plaintiff's experts, an obvious urgency to deliver by emergency cesarean section.

The defendant's delay in performing an emergency cesarean section and in providing immediate ventilation through intubation, and its discussion of subsequent neurological sequelae with the parents after the diagnosis of the grade III IVH, while not dispositive, suggest injury attributable to medical malpractice (*see Castaneda v Nassau Health Care Corp.*, 89 AD3d 782, 783 [2011] [holding that the defendants had actual knowledge of the essential facts constituting the claim because the medical records provided knowledge of the facts and suggested injury attributable to malpractice]). Thus, contrary to the majority's opinion, plaintiff's experts showed that plaintiff's injuries resulted from medical malpractice notwithstanding the premature birth.

The fact that defendant's experts have provided a different interpretation of the medical records does not show that the hospital lacked actual knowledge of the records. Instead, it shows that there is an issue as to the merits of the claim. Indeed,

the motion court acknowledged that the conflicting expert testimony would have precluded a motion for summary judgment.

In addition, defendant was not substantially prejudiced by the delay. Indeed, unlike the defendant in *Williams*, who was prejudiced by a 10-year delay (6 NY3d at 539), defendant in the present case was not substantially prejudiced by a 14-month delay. Once a municipal body receives a notice of claim, it has actual notice that a lawsuit is likely to follow and it should begin its investigation and preserve evidence, even if the notice of claim is served late and without leave of court (*see Pearson v New York City Health & Hosps. Corp. [Harlem Hosp. Ctr.]*, 43 AD3d 92, 94 [1st Dept 2007], *affd* 10 NY3d 852 [2008]; *cf. Alvarez v New York City Health & Hosps. Corp. [North Cent. Bronx Hosp.]*, 101 AD3d 464, 464 [1st Dept 2012] [no prejudice where "hospital records, which evidence an investigation in the cause of the infant's condition, provide an extensive paper trail and preserve all of the essential facts relating to this claim" (internal quotation marks omitted)]). The statute "should not operate as a device to defeat the rights of persons with legitimate claims" (*Matter of Annis v New York City Tr. Auth.*, 108 AD2d 643, 644 [1st Dept 1985]).

Defendant asserts that it has been prejudiced by the untimely notice of claim because if it had received timely notice, it would have been able to interview the staff involved while the treatment was "still fresh in their minds." This claim of prejudice is speculative at best, since the hospital has not illustrated specifically how it has been prejudiced. This court has repeatedly held that assertions of prejudice based solely on the delay in serving the notice of claim are insufficient (*Matter of Lopez v City of New York*, 103 AD3d 567, 568 [1st Dept 2013]; *see also Young v New York City Health & Hosps. Corp.*, 90 AD3d 517, 518 [1st Dept 2011] [holding that the "(d)efendant's claim that the memories of its employees are no longer at their 'most fresh' does not evidence substantial prejudice attributable to the delay"]).

Plaintiff's infancy also militates in his favor. Although a court is not precluded from examining whether infancy caused the delay in serving the notice, the Court in *Williams* noted that the "Legislature deleted the causation language" in General Municipal Law § 50-e (5) and added the simple fact of infancy as one of the considerations that should be considered (6 NY3d at 538; *see also Bayo v Burnside Mews Assoc.*, 45 AD3d 495, 495 [1st Dept 2007] [where the record demonstrates that the defendant's possession of the medical records provided actual notice of the facts constituting a claim of medical malpractice, the

infant plaintiff should not be deprived of a remedy]). Thus, although a "delay of service caused by infancy would make a more compelling argument to justify an extension," the lack of a "causative nexus" is not fatally deficient (*Williams*, 6 NY3d at 538; *see also De La Cruz v New York City Health & Hosps. Corp.*, 13 AD3d 130, 130 [1st Dept 2004] [infant plaintiff should not be penalized for mother's delay, "where defendant has been in possession of plaintiff's medical records since the time of the alleged acts of malpractice, and does not show how it has been prejudiced by these delays"]).

Lastly, this Court has repeatedly ruled that lack of a reasonable excuse is not determinative in considering a motion for leave to serve a late notice of claim (*see Alvarez*, 101 AD3d at 465). This is particularly so where the defendant had actual notice of the essential facts and was not prejudiced by the delay (*Matter of Lopez*, 103 AD3d at 568; *Renelique v New York City Hous. Auth.*, 72 AD3d 595, 596 [1st Dept 2010]; *see also Perez*, 81 AD3d at 449 ["The absence of a reasonable excuse for the delay is not, standing alone, fatal to the application, particularly in light of the lack of prejudice to (the) defendant" (citation omitted)]).

Accordingly, I would reverse and remand for further proceedings.