This opinion is uncorrected and subject to revision before publication in the New York Reports.
--------------------------------------------------------------------

No. 95
Wally G., an Infant, by His
Mother and Natural Guardian,
Yoselin T.,
            Appellant,
        v.
New York City Health and
Hospitals Corporation
(Metropolitan Hospital),
            Respondent.


            John M. Daly, for appellant.
            Marta Ross, for respondent.
            New York State Conference of Mayors and Municipal
Officials, amicus curiae.


PIGOTT, J.:

            The issue on this appeal is whether the Appellate

Division abused its discretion in affirming Supreme Court's

denial of plaintiff's motion for leave to serve a late notice of

claim on defendant New York City Health and Hospitals Corp.

(HHC).  We hold that it did not.

- 1 -

General Municipal Law § 50-e (1) (a) requires that a notice of claim be served on a public corporation "within ninety days after the claim arises."  In medical malpractice actions, "the cause of action accrues on the date when the alleged original negligent act or omission occurred" (Young v New York City Health & Hosps. Corp., 91 NY2d 291, 295 [1998] [citation omitted]).

A party seeking leave to serve a late notice of claim must make an application to the court for that relief, and the court, in its discretion, may extend the party's time to serve a late notice (see GML § 50-e [5]).  In making that determination, among other things, "the court shall consider, in particular, whether the public corporation . . . acquired actual knowledge of the essential facts constituting the claim within [ninety days] . . . or within a reasonable time thereafter."[1]  Because the decision to grant or deny an application for an extension under section 50-e (5) is "purely a discretionary one" (Cohen v Pearl River Union Free Sch. Dist., 51 NY2d 256, 265 [1980]), our review is limited to whether the Appellate Division abused its discretion in making such a determination (see Williams v Nassau County Med. Ctr., 6 NY3d 531, 539 [2006], citing Matter of Murray v City of New York, 30 NY2d 113, 119 [1972]; see also Pearson v

_____

[1]  Section 50-e (5) additionally states that there are "other relevant facts and circumstances" that the court must also consider in making its determination whether late service should be permitted.

New York City Health & Hosps. Corp., 10 NY3d 852, 854 [2010]).

Plaintiff was born prematurely by emergency cesarean section on June 15, 2005. He was transferred to the neonatal intensive care unit and discharged in stable condition on August 10, 2005.

On January 14, 2007, more than 90 days after the claim arose, without first obtaining leave of court as required by General Municipal Law § 50-e (5), plaintiff, by his mother and natural guardian, served a notice of claim against HHC alleging negligence and malpractice arising out of, among other things, HHC's failure to properly treat and manage his mother's prenatal care up until the date of plaintiff's delivery, and its failure to obtain informed consent with regard to plaintiff's neonatal and pediatric care. It was claimed that plaintiff sustained brain damage, cognitive defects, developmental, speech and psychomotor delays, fetal and respiratory distress and seizure disorder as a result of such negligence and malpractice.

Plaintiff then brought suit against HHC in August 2008,[2] but waited until December 2010, over five years after the claim arose, to move for permission to serve a late notice of

---

[2] With one exception not relevant here, the notice of claim is "an element of the substantive cause of action and as such its satisfaction must be pleaded in the complaint" (Siegel, NY Prac § 32 [Note: online treatise]). Plaintiff's complaint is not included in this record, thus raising an additional question whether plaintiff satisfied this condition precedent to bring suit.

claim.  In support of that motion, plaintiff submitted voluminous medical records along with affidavits from medical experts who, based on those records, opined that HHC's deviations from the standard of care resulted in plaintiff's injuries.

HHC cross-moved to dismiss the complaint on the ground that plaintiff failed to comply with General Municipal Law § 50-e (5).  Supreme Court denied plaintiff's motion and granted HHC's cross-motion."[3]

A divided Appellate Division affirmed.  The majority found unreasonable the excuse by plaintiff's counsel "that he waited to make the motion [for leave to serve a late notice of claim] until approximately three years and ten months after the filing of the untimely notice of claim because he needed to receive the medical records from HHC" (120 AD3d 1082, 1083 [1st Dept 2014] [citation omitted]).  It also held that plaintiff failed to establish "that the medical records put HHC on notice that the alleged malpractice would subsequently give rise to brain damage as a result of birth trauma and hypoxia or that he would subsequently develop other deficits, delays and disorders" (id.).  The dissenters, relying on our decision in Williams, asserted that HHC's hospital chart "demonstrate[d] that HHC had actual notice of the essential facts constituting the claim within 90 days of accrual or a reasonable time thereafter,"

_____

[3] Supreme Court granted plaintiff's motion for reargument, and, upon reargument, adhered to its prior determination.

stating that such records "merely need to suggest injury attributable to malpractice" (120 AD3d at 1093 [emphasis in original]). In the dissent's view, the affidavits of plaintiff's experts established that HHC's "delay in performing an emergency cesarean section and in providing immediate ventilation through intubation, and its discussion of subsequent neurological sequelae with the parents after the diagnosis of the grade III [intraventricular hemorrhage], while not dispositive, suggest[ed] injury attributable to medical malpractice" (id. [emphasis supplied]).

Plaintiff appealed to this Court as of right pursuant to CPLR 5601 (a), and we now affirm.

The affidavits submitted by plaintiff's experts simply interpreted the medical records and posited that HHC could have engaged in alternative courses of treatment which, in their view, would have produced different results, and that plaintiff's health complications could have been avoided had HHC taken a different approach. However, mere assertions that a different course of treatment could have been followed does not address whether HHC had actual knowledge of the essential facts necessary to properly defend itself in the underlying action. On this record, it cannot be said that the lower courts abused their discretion in denying service of a late notice of claim.

In Williams, we held that section 50-e (5)'s actual knowledge requirement "contemplates 'actual knowledge of the

essential facts constituting the claim,' not knowledge of a specific legal theory" (Williams, 6 NY3d at 537).  A medical provider's mere possession or creation of medical records does not ipso facto establish that it had "actual knowledge of a potential injury where the records do not evince that the medical staff, by its acts or omissions, inflicted any injury on plaintiff during the birth process" (id. [emphasis supplied]).

Contrary to plaintiff's argument and the rationale of the dissent below, the medical records must do more than "suggest" that an injury occurred as a result of malpractice. That argument implies that so long as medical experts reasonably disagree as to whether, based on their respective interpretations of the medical records, the medical staff deviated from the standard of care, a factual question is present and an application for service of late notice must be granted as a matter of law.  While we stated in Williams that there was "little to suggest injury attributable to malpractice" in that particular case, our use of the word "suggest" was not intended to deviate from our holding in that case that the medical records must "evince that the medical staff, by its acts or omissions, inflicted an[] injury on plaintiff . . ." in order for the medical provider to have actual knowledge of the essential facts (Williams, 6 NY3d at 537).

For purposes of determining whether leave to serve a late notice of claim should be granted, determinations concerning

a medical provider's "actual knowledge" and whether the medical
records "evince" that the medical provider inflicted injury on
the plaintiff rest in the sound discretion of the court.  Our
review is thus limited to whether there was an abuse of
discretion in denying service of late notice.  We discern no such
abuse of discretion.

    Accordingly, the order of the Appellate Division should
be affirmed, with costs.

Wally G. v New York City Health and Hospital Corp.

No. 95

ABDUS-SALAAM, J.(dissenting):

Because I believe that the courts below abused their discretion in holding that infant plaintiff Wally G.'s hospital records did not provide defendant New York City Health and Hospitals Corporation (HHC) with actual knowledge of injury attributable to its potential malpractice, I dissent.

Wally -- who suffers from a range of neurological and cognitive deficits and disorders, including cerebral palsy, seizures, and speech defects -- served, through his mother, a late notice of claim on HHC, without leave of court, alleging that HHC failed to timely and properly treat fetal distress and deliver him. At issue in this case is whether the courts below abused their discretion in denying Wally's motion for an order deeming the previously-filed notice of claim timely nunc pro tunc or, in the alternative, granting him permission to file a late notice of claim. Wally asserts that his motion should have been granted because HHC's medical records supplied it with actual knowledge of the essential facts constituting his present claim and therefore HHC would not be prejudiced by permitting the late filing. The majority concludes that the courts below did not abuse their discretion in denying Wally's motion because his

- 1 -

medical records did not provide HHC with actual knowledge of the facts underlying his claim.  That conclusion, however, is belied by the record in this case.

General Municipal Law § 50-e requires that a notice of claim be served on a municipal defendant in a tort action within 90 days of accrual.  Where a plaintiff fails to comply with the time limit under the statute, courts may in their discretion extend the time to serve the notice of claim (see General Municipal Law § 50-e [5]).  In determining an application to serve a late notice of claim, the court must weigh "all . . . relevant facts and circumstances," including, as relevant here, "whether the [defendant] . . . acquired actual knowledge of the essential facts constituting the claim within the time specified [in General Municipal Law § 50-e (1) (a)] or within a reasonable time thereafter" (id.).  Additionally, the court may also consider the plaintiff's infancy and whether service of a late notice of claim would "substantially prejudice" the defendant (id.; see generally Williams v Nassau County Med. Ctr., 6 NY3d 531, 535 [2006]).  Courts of this State have recognized that General Municipal Law § 50-e "is not intended to operate as a device to frustrate the rights of individuals with legitimate claims" (Matter of Porcaro v City of New York, 20 AD3d 357,357-59 [1st Dept 2005]) and because of its remedial nature, it should be liberally construed (see id.; Matter of Ruperti v Lake Luzerne Cent. School Dist., 208 AD2d 1146, 1147 [3d Dept 1994]; Robb v

New York City Hous. Auth., 71 AD2d 1000, 1001 [2d Dept 1979];

Kaiser v Town of Salina, 20 AD2d 312, 314 [4th Dept 1964]; see

also Adkins v City of New York, 43 NY2d 346, 350 [1977]).

In Williams v Nassau County Med. Ctr. (6 NY3d 531), we

addressed our standard for determining when the filing of a late

notice of claim based on actual knowledge of the essential facts

should be permitted.  We held that

> "[m]erely having or creating hospital
> records, without more, does not establish
> actual knowledge of a potential injury where
> the records do not evince that the medical
> staff, by its acts or omissions, inflicted
> any injury on plaintiff during the birth
> process.  The relevant inquiry is whether the
> hospital had actual knowledge of the facts —
> as opposed to the legal theory — underlying
> the claim" (id. at 537).

In Williams, the mother had a difficult delivery.

Nassau County Medical Center employees gave the mother Pitocin, a

drug used to facilitate birth.  Thereafter the medical staff

attempted twice to deliver the child through vacuum extraction,

but ultimately had to use forceps which resulted in breaking the

child's clavicle.  The hospital records indicated that the

mother's pelvis was inadequate in size to accommodate the child's

head, but otherwise noted that the delivery was without

complication.  The child complained that his epilepsy and

developmental disabilities were the result of the hospital's

negligence during his birth.  We affirmed the denial of a motion

to file a late notice of claim because, although the hospital

records evinced a difficult delivery, "there was scant reason to

identify or predict any lasting harm to the child" (id.).  We stated that "[w]here, as here, there is little to suggest injury attributable to malpractice during delivery, comprehending or recording the facts surrounding the delivery cannot equate to knowledge of facts underlying a claim" (id.).

As stated by the majority, our holding in Williams requires that the hospital records evince actual knowledge that the medical staff, by its acts or omissions, inflicted injury on the plaintiff.  However, contrary to the majority's conclusion, under that standard, the medical records submitted by Wally in support of his motion to file a late notice of claim demonstrate that HHC had actual knowledge of the facts underlying Wally's claim.

Wally's medical records demonstrate that mother's delivery was particularly complicated, leaving Wally with a number of defects, and as a result, the hospital could predict lasting harm to Wally.  In particular, the records show that Wally was born premature, in the seventh month of gestation. Prior to his birth, Wally's mother -- a diabetic with a history of a prior miscarriage and a prior premature birth at 29 weeks -- presented at HHC's Metropolitan Hospital on numerous occasions complaining of vaginal bleeding and blood clots.  Following multiple discharges, mother was ultimately diagnosed with possible chronic placental abruption but, nonetheless, she was again discharged from the hospital and instructed to follow up

with the clinic.  Thereafter, mother returned to Metropolitan, stating that she continued to experience vaginal bleeding and also passed blood clots.  Her condition worsened while in the hospital, demonstrating "symptom[s] of chorioamnionitis."[1]  An attending doctor's note states that at one point the fetal heart rate was in the tachycardic range, indicating an abnormal increase in the heart rate.  The hospital staff determined that mother should deliver by caesarean section, and indicated in the preoperative notes that mother in fact had a placental abruption with active bleeding.

Immediately following his birth, Wally was transferred to the neonatal intensive care unit.  According to the obstetrical chart, Wally's Apgar score[2] was five at one minute after birth and seven at five minutes.  Wally was unable to breathe on his own after birth, but was not immediately intubated.  He was eventually placed on a mechanical ventilator; however, he was already experiencing hypoxia, or lack of oxygen. Wally's hospital records also indicate that he suffered a grade III intraventricular hemorrhage (IVH).  Based on this injury, an attending spoke with Wally's parents about the possibility of

------

[1]  Chorioamnionitis is an infection of the placental membrane which compromises the ability of the placenta to supply oxygen to the fetus.

[2]  An Apgar score is used to evaluate the condition of a newborn infant.  The range is from zero to 10, with 10 being a perfect score.

brain damage and referred Wally to the developmental clinic and early intervention programs. Wally's medical records also indicate that five months following his discharge from the hospital, his mother brought him back complaining of seizure activities.

As recounted by the three expert affirmations Wally submitted in support of his motion, the hospital records show that HHC departed from good and accepted medical practice which proximately caused Wally's neurological deficits. In particular, the experts opined that mother was not prescribed the proper course of antibiotics during her earlier visits to the hospital, that Wally should have been delivered by cesarean section sooner, and that he should have been immediately intubated following birth, the failure of which likely caused his IVH. Under these circumstances, it is difficult to understand how HHC could deny having actual knowledge of the facts underlying Wally's claims.

The majority's conclusory assertion that the records, expert testimony, and other facts "do[] not address whether HHC had actual knowledge of the essential facts necessary to properly defend itself in the underlying action" (majority op. at 5), turns a blind eye to the wealth of record evidence demonstrating HHC's actual knowledge. All of the facts relied upon by Wally to support his claims of medical malpractice are in HHC's medical records, which satisfies the relevant inquiry we established in Williams -- namely, "whether the hospital had actual knowledge of

the facts -- as opposed to the legal theory -- underlying the claim" (6 NY3d at 537). To review, Wally's medical records establish that mother experienced a difficult pregnancy and was at risk of premature delivery. Mother was repeatedly discharged from the hospital despite the recurrence of vaginal bleeding. Although a placental abruption had been ruled out, it was ultimately determined that mother did in fact have a placental abruption which contributed to the vaginal bleeding she experienced. The records show that mother had chorioamnionitis and Wally experienced fetal tachycardia and hypoxia, which his experts affirm was a result of the hospital's negligence in failing to timely deliver him by cesarean section and the failure to immediately intubate him following his birth. One of Wally's experts claims that this failure likely caused his severe IVH.

Most compelling is the discussion between the hospital's medical staff and Wally's parents concerning the risk of brain damage after Wally suffered the IVH. This clearly indicates that the hospital was aware that the conditions under which Wally was born could have lasting effects. Furthermore, Wally returned to the hospital with seizure activity a mere five months after being discharged. This visit certainly put HHC on notice that Wally was potentially injured. Although Wally may have been discharged from the hospital "in stable condition" (majority op, at 3), as is normally the case, there is clear evidence in his medical records that Wally would suffer lasting

harm due to injuries resulting from his birth. Thus, it is not surprising that Supreme Court noted that if a motion were made on summary judgment grounds, the motion would be denied, and it is equally unsurprising that two justices of the Appellate Division dissented.

HHC's experts dispute Wally's claims, contending that IVH, as well as his other injuries, are common corollaries to premature delivery. However, those issues, which are relevant to the merits of the underlying malpractice claim, must be distinguished from the conceptually separate legal question of whether the medical records put HHC on actual notice that its staff may have harmed Wally.

Because Wally's medical records provided HHC with actual knowledge, Wally's delay in filing a late notice of claim did not prejudice HHC. That notice, although late and improperly served without leave of court, clearly put HHC on notice of Wally's legal claims, allowing it to commence its investigation. Our primary concern at this juncture is whether HHC's records provided it with actual knowledge of the facts underlying the claim, not the viability of that claim. Because General Municipal Law § 50-e is to be liberally construed and not present a barrier to a legitimate claim, I conclude that the courts below abused their discretion by denying Wally's motion to file a late notice of claim.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Order affirmed, with costs.  Opinion by Judge Pigott.  Chief
Judge DiFiore and Judges Stein and Garcia concur.  Judge
Abdus-Salaam dissents in an opinion in which Judges Rivera and
Fahey concur.

Decided June 9, 2016